18-2003.  To begin, I'd like to posit a law school exam hypothetical. Lender A, a Nevis corporation with its principal place of business in Missouri, extends a short-term loan to borrow a B who resides in New York. It's pursuant to a loan agreement that provides that Nevis law will govern. The loan is not usurious in Nevis, nor is it usurious in Missouri, but it is in New York. What law governs that contract? Well, I think that's an excellent conflict of law. Law school exam hypothetical, it's a terrible basis for a criminal conviction. Yet my client, Richard Mosley, has been convicted of RICO based on a single judge's answer to that law school hypothetical, an answer the judge himself acknowledged was not a home run and was not dictated by precedent. When Mosley was running this business... In fact, there are many Federal Courts of Appeals in New York cases, as this Court recognized in the Midland case before it remanded to the District Court. There are many Federal District Court cases that say that the New York policy on usury is not so fundamental that we will disregard... About the New York Court of Appeals, Schneider v. Phelps, which said, the purpose of usury laws from time immemorial has been to protect desperately poor people from the consequences of their own desperation. And the New York State Court in, I don't know how you pronounce it, a C, said New York has a strong public policy against interest rates that are excessive and that this policy must be enforced. New York courts have said over and over again that this is a strong public policy. The Court of Appeals couldn't have been clearer. We don't want people who are desperate being subjected to predatory practices. There is a conflict in the law. In this Court, if you look at your decision in the Midland case, recognize the case law was divided on this. There are cases that say it's a strong public policy and there are cases that say, well, we favor choice of law provisions generally or apply the validation rule, which says if there's any contact with the lending transaction in another jurisdiction and that jurisdiction would favor the lending transaction, then we will apply the law of that jurisdiction. But let's just assume, Your Honor, that this was unenforceable under New York law and that was the basis for the district court's decision here. The only basis for the district court's decision here, really. What does that mean? Well, New York still has to figure out what law applies. This is a basic conflict question. Whether New York would apply New York law, because one borrower in this multi-state, 650,000 loans, is by no means clear. New York might look to its own conflicts law. New York has applied the validation rule and this Court said so in the Spear case and that has not been questioned by this Court. And if it didn't apply the validation rule, it would apply the grouping of contacts rule. And according to the entire premise of the government's case, this business was conducted out of Missouri. The lenders were in Missouri, the customer reps were in Missouri, the banks were in Missouri. The borrower's residence, in this case New York, was one contact, a single contact. Of the five borrowers who testified, only one was from New York. It's by no means clear that New York would apply New York law out of the 50 states law. Remembering, by the way, that payday lending is not illegal across the nation. It's not a federal crime and many states allow it. Three things they point to for the contacts is, first of all, the acceptance of the loans would be online, not in Missouri. It's not as if people traveled to Missouri to negotiate or enter these contracts. It was online and there were New York residents in New York who would have accepted it online, right? And again, as this Court — And paid the money. And the money was paid by New York residents in New York, right? We know — I suspect that in many cases that's true, although it's not proven on this record that every New York borrower used a New York bank. But as this Court said in the Otoe, Missouri case, Internet transactions, a new thing, straddle borders. And it's a novel question which law applies. And I submit when a question is novel, when the courts themselves can't agree, to use a baseball idiom, the tie should go to the runner in a criminal case. That Mr. Mosley, under due process principles and principles of lenity, should have gotten the benefit of the doubt. That — I understand you argued — that Mr. Mosley argued he relied on advice of counsel. He recognized that there were risks, and he relied on advice of counsel. What evidence was there that he received such advice of counsel, apart from his own testimony? There were those — there were numerous, numerous letters from counsel written to state regulatory agencies saying things like, state law stops at its borders. Your state — But that's not advice to him. Well, the Court decided that it did come in as advice of counsel, because he relied on those letters for the proposition that his choice of law was legal. He started off right at the beginning meeting with counsel, and there were — he met with counsel — He never received an opinion letter, despite the — We have — neither party introduced any e-mails. I would like to point out that in the CFB — Consumer Finance Protection Board case in Missouri, the counsel, Catton, was sued, and they have settled, and the terms of the settlement are obviously confidential. But there was clearly evidence in that case that Catton was quite aware of the nature of the business and had extended him advice, that this — that these choice of law provisions were enforceable. And if, you know, there's that e-mail they pound, the government pounds about your business is in peril, well, that can mean many things. It could mean that you're not going to be able to enforce these laws, these loans in certain states because of particular states' interest rates. It doesn't mean it's a RICO violation. I don't think there's a shred of evidence in this case to suggest that a single lawyer ever told him that if he did what the government — the government's position in this case has always been, despite its argument about shams and everything else, if you — and if you had 650,000 borrowers, if you extended a single loan to a single buyer in a single state that was usurious, you violated RICO. I don't think there's any way that Mr. Mosley was on notice that RICO would be interpreted in that fashion. And I don't think there's anything in this record that's — RICO's express language, though, makes criminal the enforcement of loans at twice the — a usury rate, doesn't it? I mean, this is — unlike most of RICO, this is very much in the text. It is a very — I have read that language so many times. And it is — you could read it as being clear if you ignore the fact that it's never been used this way, because this is not what it was intended for. It was intended for loan sharking. We have a system in this country of 50 states with 50 sets of usury laws, and no federal crime involved in payday lending. And sure, you might be able to extract out of this language of RICO, in one case, a RICO violation. But at this point in time, Mr. Mosley is the only person in this country who's been charged with RICO for this offshore model. I know there are the tribal entity cases that raise different issues about sovereign immunity with tribes. We have Tucker pending right here. You have Tucker pending, and those are very different issues. This is more of a contractual choice of law issue. And I think the far-reaching use of RICO here was unconstitutional. You have two minutes of rebuttal remaining. Okay. Okay. Thank you very much. Good morning. Please, the Court. My name is David Abramowitz. I represent the United States on appeal, and I also represented the United States at trial. The judgment should be affirmed. The government's position in this case is that there was a RICO violation, and the RICO statute is very clear. It is illegal to participate in the affairs of an enterprise through the collection of unlawful debt. This is not a case about one loan to a New Yorker among 650,000 loans. There was evidence of thousands of loans going to New Yorkers from Moseley's company. But there's very little or even no published authority on construing unlawful debts to apply to these kind of loans. Isn't that right? No, Your Honor. The statute is the authority. I know that we were just discussing the statute, but with the meaning of enforcement of unlawful debt, I suppose, is somewhat new. Your Honor, the statute is clear, and this Court's ruling in Biasucci is clear, and this is no more complicated than that. The statute says what an unlawful debt is, if it would be unenforceable in whole or in part under State or Federal law. As said, just as in Biasucci, if the loan is extended or the debt is collected in New York, you look to New York's usury law, which it's undisputed, it is very low, about 25 percent. And here, we were dealing with interest rates at a minimum of 600 percent. That is all the analysis that's needed here. There's no need to get into choice of law or anything else of that sort. I would note, however, that even if you were to go down that road, which is not necessary, the defendant still loses here for multiple reasons. For one, there cannot be any choice of law issue where, as the jury found here, in many cases, there was not even a meeting of the minds. There was no contract. He was convicted of wire fraud. And the fraud was that, as witnesses testified, including at least one victim from New York, the fraud was that there was no agreement. The agreements were a sham. The so-called borrowers never saw these agreements and didn't even realize they were getting loans. They were dropped in their bank accounts, and then withdrawals were made every other week, for as long as Moseley decided to make those withdrawals. Are you familiar with the litigation or the appeal in Tucker? I'm somewhat familiar with it. I don't believe that this conflict of laws issue. I'm just wondering whether you know enough about it to – I know it concerns both payday lending and the TILA disclosures. It does. In a very similar setting, except with an added overlay of tribal immunity. It is similar, and it was charged around – that case was charged around the same time this case was charged. And it is a RICO case against a payday lender. It's not a so-called loan shark or a mob case or anything like that. I would like to make one point on the TILA issue that Your Honor raised. It's the truth in lending box. So there is one truth in lending act box on page 69 of the defense brief, and that is from a contract that's also in the supplemental appendix at page 363. And that is an example from a 2008 contract that Moseley was using. And for the reasons stated in our brief, it is misleading. It is enough to constitute a violation of TILA. The total of payments box is simply untrue. But one thing I'd just like to make very clear is that there are other examples of TILA violations in the record, and I'll point you to one in a moment, that are much more egregious than even that. And so I point the Court, if there's any question, to supplemental appendix at page 371, 371. And this is a later version of Moseley's contract. This was from January 2013. And if you look at the boxes there that talk about the total of payments, the payments that are going to be made on this loan, they are explicit. It promises that a lender, a so-called borrower on a $300 loan will make one payment that's what it says in the box, one payment of $390. And I know in the defense brief there's a lot of discussion about, in the box that was printed there, about the fine print under these boxes that talks about automatic refinancing. Well, if the Court looks at supplemental appendix 371, they will see there is no such language anywhere on that page about automatic refinancing or automatic renewals or the need to take some affirmative step to ensure that it's just one single payment. You'd have to go digging around that contract. And I'm not sure that came through clearly enough in our briefs, but I did want to raise that point. But that's in your supplemental appendix. That's in the supplemental appendix at page 371. And that's over time. He made the point, and that was all before the jury. Roberts. Let me just ask you about, assuming we do have to look at choice of law to determine whether or not this is an awful debt under New York law, they cited in their briefs, and they made, I think, made mention today about the Spears case to say that the rule of validation would apply here and that under New York law this would be valid. Can you address that? The rule of validation point, Your Honor? Yes. And the Spears case, they say that the Spears case are we have decided that the rule of validation essentially would apply to this situation. So a couple points on that. So first, the Spears case, like the other rule of validation cases that have been cited, all involved sophisticated borrowers. That was, I believe, a restaurant owner, right, that borrowed a loan to renovate a restaurant. This was not the type, the sort of hallmark of these usury, the hallmark borrower that these usury laws are designed to protect, as was the case here. But more than that, Moseley concedes in the reply brief that even under Missouri law, these loans were unlawful. And that's in the reply brief at pages 15 to 16. The Missouri statute that was in effect does not allow licensed lenders to charge interest rates above, I think it was, 75 percent. Moseley was not even allowed to charge interest rates. He was not even licensed. But in any event, the interest rates he charged were all, it's undisputed, at a minimum of 600 percent. So even under the validation rule, Missouri law does not help him. I would also add that there was no indication to any of these so-called borrowers, who are really victims, that anything, although everything was happening in Missouri from the lender's perspective, that wasn't clear to anybody who received these loans. They actually didn't go on a website of the lender. They went on a website to enter information to, you know, send out to lots of lenders to get offers for loans. There was — Moseley tried to hide the fact that he was really in Missouri. So there's really no road we can go down that ends with the result that some law other than New York law or other than some law that — there's no road you can go down that ends with the result that these loans were appropriate and were not usury. So am I right in understanding your opening position is then there was no agreement in most of these cases, and if there was an agreement and we apply the validation rule, then Missouri law would apply and it doesn't permit these. Is that — I got it wrong? No. If Missouri law applied, it still would not permit these loans. We don't think the validation rule applies. We don't think we need to get nearly that far. But even under the validation rule, if you apply Missouri law, right, he still — he still loses. Okay. And unless the Court has any other questions, we'll rest on our submission. All right. Thank you. Ms. Edelson, you have two minutes. There's a lot to respond to. First, we have not agreed that these loans would be usurious under Missouri law. That never came up at trial. The government did not — the defense asked that the jury be charged on Missouri law, and that was denied. I know, but wouldn't that be harmless if it wasn't under Missouri law? But I don't believe it is usurious. Remember, the — RICO doesn't say the loan is unenforceable because twice the interest rate. The loan is unenforceable because of Missouri's usury laws. There is a wealth of commentary that Missouri welcomed payday lenders, that they did not consider these loans usurious. And, in fact, there was a statute in Missouri at the time that said parties can agree on an interest rate that is — would not be permitted under the statute. And the law that the government cites for the first time in its brief is a law that says a borrower can't be required to make good on more than six refinancing charges. It doesn't say that — and they haven't cited a Missouri case, and I haven't found one that said if you charged the seventh one, it would make the law usurious. But I want to very quickly turn to this notion that these loans — that there were no — that there was not a sham. First of all, if you take the RICO out of the case, we've argued prejudicial spillover. And if you take the RICO out of the case, the Wire fraud case, despite what the government says, was very conflicted. It consisted of evidence from their cooperating witness who, the first day for four separate times, said that my client thought there was an e-signature and Joel Tucker told him there was an e-signature, only came back the second day after she met with the government and said that, oh, no, no, we never knew there was an e-signature. There was a template prepared by eData's employee, Lindsay Radleff, that said, this is how you respond to a complaint, you have an e-signature. And also there was tremendous number of fail-safe methods to make sure the customer knew that they were getting a loan. I'm going to point out that the red light is on. We have a very full calendar today. I'm sorry I can't let you go on. Thank you very much. I think we have the arguments. We'll take the matter under advisement.